UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MARK S. PALMQUIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:07-cv-00098-JAW |
| | ) | |
| ERIC K. SHINSEKI, Secretary, | ) | |
| Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON POST-VERDICT MOTIONS TO AMEND THE JUDGMENT, FOR JUDGMENT AS A MATTER OF LAW, AND FOR NEW TRIAL**

Faced with an adverse jury verdict in this action for retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, Mark S. Palmquist seeks to amend the judgment to grant him mixed-motive remedies, judgment as a matter of law, and, in the alternative, a new trial. The Court denies Mr. Palmquist's motion for mixed-motive remedies because the law does not authorize those remedies in retaliation cases under the Rehabilitation Act and denies Mr. Palmquist's motions for judgment as a matter of law and for a new trial because the jury's verdict is supported by the evidence.

I. **STATEMENT OF FACTS**

A. **Procedural History**

On December 2, 2010, after a four day trial, the jury issued a verdict finding the United States Department of Veterans Affairs (VA) not liable for retaliating against Mr. Palmquist in violation of the Rehabilitation Act. *Verdict Form* (Docket # 174). Specifically, the jury found that Mr. Palmquist had engaged in protected

activity, that his supervisor took an adverse employment action by giving him a negative employment reference for a promotion he sought, and that retaliation for the protected activity was not a motivating factor in the adverse employment action. *Id.* The jury found that retaliation was a motivating factor in the VA's decision not to hire Mr. Palmquist for the position, but it found that the VA would have made the same decision without the consideration of retaliation. *Id.*

On January 3, 2011, Mr. Palmquist moved for judgment as a matter of law, to amend the judgment, and for a new trial. *Pl.'s Mots. to (1) Renew Trial Mots. for J. as Matter of Law; (2) to Am. Dec. 3, 2010 J.; and (3) for New Trial* (Docket # 185) (*Pl.'s Mot.*). On January 24, 2011, the VA responded. *Def.'s Opp'n to Pl.'s Mots. to Renew, Am. the Verdict, and for New Trial* (Docket # 188) (*Def.'s Opp'n*). On February 7, 2011, Mr. Palmquist replied to the VA's response. *Pl.'s Reply in Supp. of Pl.'s Mots. to (1) Renew Trial Mots. for J. as Matter of Law; (2) to Am. Dec. 3, 2010 J.; and (3) for New Trial* (Docket # 189) (*Pl.'s Reply*).

## B. The Evidence at Trial

### 1. Mr. Palmquist's Case

#### a. Sherry Aichner's Testimony

Sherry Aichner has worked for the VA since 1973. *Trial Tr. I* 57:18-20 (Docket # 181). In 2004, she was a supervisor in the VA's nursing home care unit in Iron Mountain, Michigan. *Id.* 58:1-4. She hired Mr. Palmquist to join the unit in April 2004 as a Unit Coordinator. *Id.* 99:10-13. Beginning May 20, 2004, she supervised Mr. Palmquist in that role. *Id.* 58:1-21, 60:10-12. When Ms. Aichner

interviewed Mr. Palmquist she thought he seemed "upbeat" and "jolly;" she thought he had a "positive personality" that would fit with their units. *Id.* 101:8-10.

Ms. Aichner knew that Mr. Palmquist had a ten-point hiring preference for disabled veterans that entitled him to certain hiring preferences. *Id.* 65:12-22. She was further aware that Mr. Palmquist applied for the position of Chief of Voluntary Services in July 2004 and that he was not interviewed for the position. *Id.* 66:3-11. When he was not interviewed, Mr. Palmquist told Ms. Aichner that he was qualified for the position and that he was going to talk to the Equal Employment Opportunity (EEO) specialist and write his congressman about his concern at not being interviewed. *Id.* 66:21-67:14. Ms. Aichner understood his concern to be that his veteran's preference rights were not being honored. *Id.* 67-68. She knew that he had a right to make those complaints and that it would be unlawful to retaliate against him for making those complaints. *Id.* 68. She testified that she did not hold Mr. Palmquist's complaints against him. *Id.* 125:14-21.

After Mr. Palmquist made his complaints, Ms. Aichner gave him four positive performance evaluations. Two were annual performance appraisals. *Id.* 58:22-59:13. The other two were written performance appraisals in connection with promotions for which he applied. *Id.* Each appraisal was entirely favorable and contained nothing negative. *Id.* 58:24-65:1. Despite the positive appraisals, she testified that Mr. Palmquist could become distracted and distracting at work. She testified that he would sometimes make loud noises that would distract others in the unit and that he occasionally used his computer for non-work purposes. *Id.*

109:4-111:2.  She further testified that he would sometimes leave the unit during working hours to socialize, get food, see doctors without taking sick leave, or speak with the union representative.  *Id.* 109:19-112:22.  Ms. Aichner said this caused some problems in the unit.  *Id.* 113:2-113:22.  She spoke with Mr. Palmquist and resolved these issues.  *Id.* 114:10-21.  Despite the issues in the unit, Ms. Aichner maintained a friendly relationship with Mr. Palmquist.  She testified that she liked Mr. Palmquist and helped him find a house near where she lived.  *Id.* 115:13-116:15.  As neighbors, she also got to know Mr. Palmquist's son, and the three of them would occasionally visit.  *Id.* 116:18-117:21.  Ms. Aichner testified that their friendly and neighborly relationship lasted until Mr. Palmquist moved to Maine in 2006 and that she still likes him.  *Id.* 171:22-24.

In February 2006, Mr. Palmquist told Ms. Aichner that he had applied for a position with the VA in Tennessee.  *Id.* 70:5-11.  Ms. Aichner testified that Mr. Palmquist listed her as a reference because he thought she would give him a good reference.  *Id.* 160:22-24.  On March 9, 2006, Ms. Aichner received a phone call from Delores Tate asking for a reference in connection with Mr. Palmquist's application.  *Id.* 70:12-15, 73:6-8, 161:5.  Ms. Aichner told Ms. Tate that Mr. Palmquist was energetic, knowledgeable, and a quick learner.  *Id.* 73:13-15, 165:7-9.  She also told Ms. Tate that Mr. Palmquist is pro-veteran to the point he "goes overboard/oversteps the boundaries of his job."  *Id.* 73:16-20.  She also reported that it is hard to get Mr. Palmquist to sit and that he wanders around a bit.  *Id.* 73:21-24.  She further reported that Mr. Palmquist "uses his service-connected preference

and watches carefully to make sure he gets an interview," and she gave Ms. Tate an instance when Mr. Palmquist did not get an interview so he went right away to a patient representative *Id.* 74:3-12. Ms. Aichner acknowledged that the instance referred to Mr. Palmquist's complaint to the EEO[1] when he was not interviewed for the Chief of Voluntary Services position. *Id.* 74:13-75:11.

Ms. Aichner testified that she tried to answer Ms. Tate's questions honestly and thought her answers would be considered positive for Mr. Palmquist. *Id.* 77:4-80:12. Specifically, she testified that her comments about Mr. Palmquist being pro-veteran would be considered positive because he was applying for a position that involved helping veterans. *Id.* 79:14-80:1. She noted that she had called Mr. Palmquist pro-veteran in previous positive appraisals and that she intended to convey the same message to Ms. Tate. *Id.* 134:5-14, 140:17-141:12. Similarly, Ms. Aichner testified that she thought her reference to Mr. Palmquist's complaints would be considered positive because it would show his enthusiasm for advancement in the VA. *Id.* 80:16-81:6. She testified that she did not retaliate against Mr. Palmquist for making complaints and that she had no reason to retaliate because she was not involved in the interview or selection process for the Chief of Voluntary Services position. *Id.* 164:14:19.

Mr. Palmquist later came to Ms. Aichner's office "screaming and yelling" that he did not get the Tennessee position because she had given him a bad reference.

---

[1] It is not entirely clear whether Mr. Palmquist complained to the EEO or filed a union grievance after he was not hired for the Chief of Voluntary Services position. *See Trial Tr. III* 478:11-13 (Docket # 183).

*Id.* 165:12-17.  Ms. Aichner responded that she did not believe she gave him a bad reference.  *Id.* 167:4-15.

### a.  Delores Tate's Testimony

Delores Tate testified next in Mr. Palmquist's case.  Ms. Tate works at the VA Regional Office in Nashville, Tennessee.  *Trial Tr. II* 219:1-3 (Docket # 182).  That office is a benefit entitlement center that processes claims for VA benefits.  *Id.* 219:7-13.  Ms. Tate explained that in 2006 Mr. Palmquist applied to be a Rating Veteran Service Representative (RVSR).  *Id.* 190:24-25.  An RVSR examines evidence and makes decisions based on VA laws and regulations regarding eligibility for compensation, pension, and any other benefits administered by the VA.  *Id.* 225:16-20.  An RVSR works at a desk in a boisterous office environment, should stay focused in such an environment, and should be fair and objective in evaluating claims.  *Id.* 238:4-240:13.

Ms. Tate knew Mr. Palmquist had a ten point veteran's preference.  *Id.* 191:19-21.  Mr. Palmquist was qualified for the position and he was one of twenty applicants interviewed from a pool of seventy-two applicants.  *Id.* 192:22-193:11.  Ms. Tate and subject matter expert Glenda Taylor interviewed Mr. Palmquist on March 3, 2006.  *Id.* 193:24-194:8.  Ms. Tate thought Mr. Palmquist had a positive interview.  *Id.* 194:17-24.  He informed Ms. Tate and Ms. Taylor that he wanted a challenge and to use his master's degree.  *Id.* 276:20-23.  At the end of every interview, Ms. Tate and Ms. Taylor asked the applicant not to contact them and told the applicant that he or she would be notified of the final decision.  *Id.* 254:5-255:1.

However, on March 6, 2006, Ms. Tate received an email from Mr. Palmquist. *Id.* 278:1-3. In the email, Mr. Palmquist thanked Ms. Tate and Ms. Taylor for the chance to be interviewed and reiterated his qualifications. *Id.* 278:4-12. Ms. Tate thought the email was inappropriate because it violated her instructions against post-interview contact and gave Mr. Palmquist an unfair opportunity to persuade her to select him for the position. *Id.* 278:21-279-11. She forwarded the email to her supervisor immediately. *Id.* 279:9-11.

If it had been solely up to her, Ms. Tate would have dismissed Mr. Palmquist from the application process after receiving the email. *Id.* 282:16-18. However, Ms. Taylor did not think the email warranted dismissal even though she agreed it was inappropriate. *Id.* 282:19-24. Mr. Palmquist's positive interview qualified him for the next stage of the application process, and Ms. Tate called Mr. Palmquist's references. *Id.* 195:5-9. She first called Greg Weiss who had supervised Mr. Palmquist in the non-employment setting of vocational rehabilitation training. *Id.* 195:23-196:23, 275:3-277:7. Mr. Weiss gave Mr. Palmquist an entirely positive reference on March 8, 2006. *Id.* 195:23-196:23. Ms. Tate then contacted Ms. Aichner. *Id.* 197:3-4. Ms. Tate explained that her notes from the conversation are just a brief synopsis and rephrase what was said. *Id.* 197:12:14. She considered Ms. Aichner's statement that Mr. Palmquist was pro-veteran to the point of going overboard as unfavorable for the RVSR position because it suggested bias. *Id.* 197:9-200:8, 284:9-285:2. She also considered unfavorable Ms. Aichner's comments about Mr. Palmquist's tendency to wander and his use of his veteran's preference.

*Id.* 200:9-15. Ms. Tate did not think that she had asked Ms. Aichner about Mr. Palmquist's use of his veteran's preference, but she could not remember for sure. *Id.* 200:23-202:6. Ms. Tate's notes also reflected that Ms. Aichner told her that Mr. Palmquist had unsuccessfully applied for several positions at the VA. *Id.* 202:15-203:4. Ms. Tate considered this neither favorable nor unfavorable because applying for numerous jobs could demonstrate ambition and provide interviewing experience. *Id.* 202:15-203:14. Ms. Tate did not get the feeling that Ms. Aichner was trying to prevent her from selecting Mr. Palmquist for the RVSR position. *Id.* 211:13-14.

Ms. Tate made her recommendations for the RVSR position by March 15, 2006. *Id.* 205:16-19. Mr. Palmquist was one of only two applicants who received an unfavorable reference. *Id.* 208:11-209:20, 265:24-266:12. The unfavorable reference was a factor in Ms. Tate not recommending Mr. Palmquist for the RVSR position. *Id.* 209:24-210:1. She testified that she neither discriminated against him because he was a disabled veteran nor retaliated against him for his complaints. *Id.* 287:9-18.

### 2. The VA's Defense

#### a. Mr. Palmquist's Testimony

Mr. Palmquist was a United States Marine from 1984 until 1988. *Trial Tr. III* 413:1-6 (Docket # 183). He then worked in the private sector for several years before obtaining employment as a customs inspector for the federal government. *Id.* 413:22-414:15. In his federal employment, he came to understand the General Schedule (GS) according to which federal employees are paid. *Id.* 414:19-415:22.

He explained that the GS is made up of pay grades and that within each pay grade there are a number of steps. *Id.* 415:3-9. As a customs inspector, he obtained a pay grade of GS-7. *Id.* 415:23-416:2. He was terminated from the Customs Service for being absent without leave (AWOL). *Id.* 418:4-10. He then returned to the private sector for several years before getting a job with the United States Postal Service in Menominee, Michigan. *Id.* 418:20-419:6. He left the Postal Service in 1998 to enter VA vocational rehabilitation. *Id.* 420:1-423:1. The vocational rehabilitation program is a benefit for veterans. *Id.* 423:22-25. As part of the program, the VA paid for Mr. Palmquist's education at the University of Northern Michigan. *Id.* 424:15-16. Mr. Palmquist hoped this would improve his employment prospects, and he considered the federal government a potential employer. *Id.* 424:16-425:24. Greg Weiss was Mr. Palmquist's counselor in vocational rehabilitation. *Id.* 426:6-7.

Mr. Palmquist was in vocational rehabilitation from 1998 until he got a job at the Iron Mountain Veterans Medical Center in Michigan in 2004. *Id.* 426:3-4. When Mr. Palmquist applied to Iron Mountain, he claimed a ten-point preference for disabled veterans. *Id.* 432:7-13. He testified that regular veterans are entitled to a five-point preference and that veterans with thirty percent or more disability are entitled to a ten-point preference. *Id.* 432:14-18. The preference is an advantage in the hiring process. *Id.* 432:19-21. His Iron Mountain application misstated his GS level and salary with the customs service. *Id.* 434:24-425:24. He stated that he had been a GS-11 making $35,000 a year when in fact he had been a GS-7 making $22,000 a year. *Id.* After receiving the job at Iron Mountain,

Charlene Nerone from the human resources office contacted Mr. Palmquist to let him know that she had discovered the misstatement in his applications. *Id.* 439:5-22. Ms. Nerone allowed him to correct the misstatements. *Id.* 440:1-3.

Ms. Aichner was Mr. Palmquist's supervisor at Iron Mountain. *Id.* 444:14-21. In that role, she had a non-confrontational style of discipline. *Id.* 445:8-10. She preferred to talk to employees about problems rather than warn them or engage in formal discipline. *Id.* 445:11-13. She had several conversations with Mr. Palmquist to resolve work issues. 445:14-446:25. Mr. Palmquist denied Ms. Aichner's testimony that he often left his desk to socialize with others. *Id.* 456:9-23. However, he admitted he counseled veterans regarding matters for which other specialists were supposed to provide counseling. *Id.* 459:12-460:17

In July 2004, Mr. Palmquist learned there was an open position for Chief of Voluntary Services. *Id.* 461:5-10. The position started at a GS-11 level, six levels higher than Mr. Palmquist's GS-5 level. *Id.* 463:23-464:3. Mr. Palmquist did not have the requisite one year of relevant experience at the next lower grade level. *Id.* 464:12-18. Nor did he have the educational level that could have substituted for that experience. *Id.* 464:22-25. However, Ms. Nerone told Mr. Palmquist that his veteran's preference could qualify him as an external candidate. *Id.* 465:15-466:2. He applied and was found qualified. *Id.* 466:24-467:2. He understood his qualifying to mean he was eligible to remain in the applicant pool, not that he was entitled to the position. *Id.* 467:17-23. Mr. Palmquist was not selected to be interviewed. *Id.* 469:23-24. He complained about the selection process to the human resources office

at Iron Mountain, to his congressman, and to the Secretary of the VA. *Id.* 476:17-477:8. Specifically, he complained that his disabled veteran's preference had been violated. *Id.* 478:3-10. He also filed a union grievance to that effect. *Id.* 478:11-13. Management responded to Mr. Palmquist's complaints with a letter stating that the selected candidate had more relevant experience than Mr. Palmquist. *Id.* 483: 1-14. Specifically, the letter explained that the selected candidate had recreation therapy experience with a voluntary service setting in a medical center. *Id.* 485:8-12. Management also met personally with Mr. Palmquist. 485:16-20. In the meeting and in a follow-up memo, management explained that the Chief of Voluntary Services position was not covered by the master agreement between the union and management because it was a management position. *Id.* 487:2-12. It further explained that, from management's perspective, it had observed Mr. Palmquist's veteran's preference and he was not entitled to an interview. *Id.* 489:6-24.

Mr. Palmquist was aware of the several positive evaluations Ms. Aichner gave him. *Id.* 503:6-532:19. First, she gave him a positive annual performance evaluation in April 2005 with no negative comments. *Id.* 503:6-505:16. He testified that he asked her for references for the Claims Assistant position he applied for in May 2005 and the Program Support Clerk position he applied for in November 2005 and that she provided entirely positive references. *Id.* 507:18-25, 512:23-518:2, 521:25-522:3, 525:20-529:11. He further testified that he was aware of the positive annual performance review she gave him in 2006. *Id.* 529:20-532:19. Mr.

11

Palmquist also agreed that Ms. Aichner was friendly to him, helped him find a house, and was a good neighbor.  *Id.* 506:22-507:14.

Mr. Palmquist then testified about the RVSR position he applied for in 2006. *Id.* 532:20-23.  Mr. Palmquist knew that the job would require him to make fair and objective decisions without any bias or prejudice.  *Id.* 537:21-23.  He also knew that it was a GS-10 job that required either one year of relevant experience in the next lower grade or a Ph.D or equivalent degree.  *Id.* 538:20-539:9, 540:11-542:2.  When he applied, Mr. Palmquist was working toward his master's degree and had one more class to complete.  *Id.* 542:8-19, 578:6-579:4.  He completed that class on March 4, 2006.  *Id.* 579:5-7.  He stated in his application that he had completed his master's degree even though he would not complete it for another three months.  *Id.* 544:16-545:1.  Although he met neither the time-in-grade nor the education requirement, he was able to apply as an external candidate and a disabled veteran. *Id.* 544:9-15.

Mr. Palmquist had what he considered a positive interview with Ms. Taylor and Ms. Tate on March 3, 2006.  *Id.* 552:7-25.  Among other things, he told them that he wanted to use his master's degree.  *Id.* 553:10-12.  In his testimony he acknowledged that he did not have his master's degree at that time but explained that the interviewers knew this because he had sent them his transcript.[2]  *Id.*

---

[2] At this point in Mr. Palmquist's testimony, the Court instructed the jury that the VA did not discover the misrepresentations in Mr. Palmquist's application until after the VA made its decision on his application.  *Id.* 555:25-556:2.  Because his purported misrepresentation could not have affected the VA's hiring decision, the Court instructed the jury that it could only consider whether Mr. Palmquist was truthful on his RVSR application for the purpose of assessing his credibility, not for liability.  *Id.* 556:2-8

553:24-553:4. Mr. Palmquist denied that Ms. Tate instructed him at the end of the interview not to contact them for the remainder of the process. *Id.* 556:11-21. However, he testified that he understood why such extra contact would be unfair, and he acknowledged that he sent two emails to Ms. Tate and Ms. Taylor after the interview. *Id.* 557:4-24.

On March 22, 2006, Mr. Palmquist found out that he was not selected for the RVSR position. *Id.* 558:18-24. On March 24, 2006, he complained to the EEO that Ms. Tate had discriminated against him. *Id.* 559:18-20, 561:20-22. On April 26, 2006, an EEO counselor told him that he did not get a good reference. *Id.* 562:12-14. Mr. Palmquist was upset. *Id.* 562:15-16. He contacted the union president and the two of them went to Ms. Aichner's office. *Id.* 562:22-563:2. He told Ms. Aichner that he had been informed that she gave him a bad reference, and she responded that she gave him neither a good nor a bad reference. *Id.* 564:11:24. Mr. Palmquist testified that, in his view, Ms. Aichner discriminated and retaliated against him. *Id.* 575:15-19.

### b.    Patricia Sydmark Testimony

Mr. Palmquist's co-worker at Iron Mountain, Patricia Sydmark, also testified. *Id.* 587:14-16. She testified that she had to pick up a lot of the slack on the job because Mr. Palmquist would often leave his work station. *Id.* 589:1-11. She did some of his work and corrected some of his work. *Id.* 589:14-16. She did not report his conduct because she did not like to tattletale. *Id.* 589:20-590:3.

Ms. Sydmark previously filed an EEO complaint against Ms. Aichner because she believed Ms. Aichner was allowing Mr. Palmquist to work more favorable hours. *Id.* 591:8-593:2. She thought that Ms. Aichner acquiesced to Mr. Palmquist's demands for better hours because Ms. Aichner felt intimidated by him. *Id.*

### c. Glenda Taylor's Testimony

The VA called Glenda Taylor, who worked with Ms. Tate to fill the RVSR position in Tennessee. She testified that at the end of each interview, Ms. Tate specifically instructed each applicant not to contact them. *Id.* 603:18-23. Ms. Tate did not have that instruction written down. *Id.* 604:19-21. Ms. Taylor agreed that the notes from Ms. Tate's conversation with Ms. Aichner reflected some negative information about Mr. Palmquist. *Id.* 606:21-607:2. Ms. Taylor did not know why Ms. Tate included in her notes Ms. Aichner's statement regarding Mr. Palmquist's veteran's preference. *Id.* 610:24-612:25.

### d. Charlene Nerone's Testimony

Ms. Nerone was a Recruiting Specialist for the VA's human resources department at Iron Mountain. *Id.* 617:8-13. She explained the hiring process at the VA. *Id.* 619:24-620:13. She described "hiring authorities" as a way the VA could target certain kinds of people to hire. *Id.* 620:11-13. For example, someone who previously worked in the federal service might be targeted under a "reinstatement authority." *Id.* 620:14-20. She said there were authorities targeting different types of veterans. *Id.* 620:21-621:2. If an applicant did not meet the qualifications under a hiring authority, the applicant could apply externally and explain why either his

experience or education was equivalent to the hiring authority qualifications. *Id.* 623:16-625:2. Ms. Nerone would then determine who was qualified by matching the information on the applications with the position descriptions. *Id.* 626:1-6. She then referred her list of qualified candidates to the selecting official. *Id.* 626:9-10. She would submit separate lists for separate hiring authorities and for external candidates. *Id.* 626:12-19. She explained that a veteran's preference only gave an applicant an advantage over other applicants on the same list. *Id.* 629:25-630:14. Ms. Nerone described her selections as the first cut in the process. *Id.* 627:8-10. Beyond that, it is "all up to the supervisor." *Id.* 627:11-16. The supervisor would select which applicants to interview, and those selected would be interviewed with a common set of questions. *Id.* 627:16-628:19. The supervisor may also check references. *Trial Tr. IV* 644:3-5. (Docket # 184). Once the supervisor made a selection, Ms. Nerone would review the selection and make a tentative offer. *Id.* 642:24-643:2.

She also explained that her duties involved helping to administer Iron Mountain's affirmative action program for disabled veterans. *Id.* 676:20-25. The program was designed to comply with federal laws. *Id.* 677:1-5. The goals of the Iron Mountain program included hiring disabled veterans and improving their internal advancement opportunities. *Id.* 677:10-15. Iron Mountain gave information about the affirmative action program to every employee when he or she was hired. *Id.* 677:20-23, 680:11-17. She testified that the program aims to give disabled veterans enhanced opportunities for advancement within the federal

service. *Id.* 680:22-682:5, 693:8. However, she also testified that a veterans'
preference does not apply to a promotion within the federal service. *Id.* 639:25-
640:2. She explained that "[t]hey've already used their veteran's preference to get
into the system, so once they are a career-conditional employee and they are
applying under the merit promotion program we don't—they don't use the veteran's
preference any longer." *Id.* 640:4-8.

Ms. Nerone testified that Mr. Palmquist applied to work at Iron Mountain
under the reinstatement authority by virtue of his work at the Customs Service. *Id.*
650:18-20. He qualified for the position, but Ms. Nerone noticed a discrepancy
between his application and his personnel folder: he stated that he had been a
customs inspector at GS-9 when in fact he had been a GS-7. *Id.* 651:1-9. This could
have impacted his qualification, but Ms. Nerone noticed that he had sufficient
education to substitute for the time-in-grade qualification. *Id.* 653:1-9. She called
Mr. Palmquist and allowed him to correct the discrepancy. *Id.* 652:10-659:8.

After Mr. Palmquist started working at Iron Mountain, he would occasionally
come to Ms. Nerone's building to socialize with the women there. *Id.* 659:17-660:2.
He also came over to express interest in the Chief of Voluntary Service position. *Id.*
661:5-7. Ms. Nerone described the position as an important one with many
responsibilities. *Id.* 662:6-15. Mr. Palmquist came to realize that he would not
qualify as an internal candidate. *Id.* 664:10-25. However, the selecting official,
Paul Noury, eventually opened the position to outside candidates because he
wanted a wider pool. *Id.* 666:4-13. Mr. Palmquist applied as an external candidate

and was found qualified. *Id.* 669:2-6. He was awarded his ten-point preference, which helped him "float to the top…of the list" of external candidates. *Id.* 669:7-8. Accordingly, his application was sent along to Mr. Noury. *Id.* 669:11-12. However, Mr. Noury did not select Mr. Palmquist for an interview. *Id.* 669-70.

### e. Paul Noury's Testimony

Mr. Noury was the Associate Medical Center Director at Iron Mountain. *Id.* 707:13-14. He was responsible for setting goals for the affirmative action program and for its ultimate success. *Id.* 733:14-18. One of those goals was to improve internal advancement opportunities for disabled veterans. *Id.* 733:19-24.

Before beginning his career with the federal government, Mr. Noury served in the United States Navy. *Id.* 708:18-709:1. His status as a veteran gave him a five-point preference that helped him get his first job with the federal government as a clerk-typist. *Id.* 709:3-15. He served in a number of federal service positions all over the country before coming to Iron Mountain in 1998. *Id.* 709:3-716:13. He testified that he unsuccessfully applied for "about forty" other positions during that time. *Id.* 718:6-20.

Mr. Noury was the selecting official for the Chief of Voluntary Services position in 2004. *Id.* 718:21-25. He listed the duties and qualifications for the job in the announcement of the open position. *Id.* 720:22-721:9. He opened the hiring to external candidates in addition to internal candidates because he was concerned they would not get enough internal candidates. *Id.* 722:3-24. He knew that Mr. Palmquist was a qualified candidate on the external list. *Id.* 736:22-4. However, he

explained that internal candidates are preferable because of labor agreements, because hiring them supports upward mobility and job satisfaction within the federal service, and because of their familiarity with the setting. *Id.* 723:9-20. When he reviewed the internal list for the Chief of Voluntary Services position, he was happy to see that there were a number of very good, highly qualified candidates who had worked with Voluntary Service. *Id.* 724:13-19. When he looked at the list of external candidates, it did not look comparable to the list of internal candidates, so he did not interview anyone from the external list. *Id.* 728:17-25. The candidates on the external list would not have known the reasons he did not interview them. *Id.* 737:13-17. He testified that he neither discriminated against Mr. Palmquist nor failed to observe his veteran's preference. *Id.* 731:11-15.

## II.    THE PARTIES' POSITIONS

### A.    Mr. Palmquist's Motions

#### 1.    Motion for Mixed-Motive Remedies

Mr. Palmquist argues that the jury's affirmative answer to question number four on the verdict form entitles him to declaratory judgment, injunctive relief, attorney fees, and costs. *Pl.'s Mot.* at 1. By answering "yes" to question number four, the jury found that Mr. Palmquist proved by a preponderance of the evidence that retaliation was a motivating factor in the VA's decision to deny Mr. Palmquist the RVSR position. *Verdict Form*. Mr. Palmquist concedes that he is not entitled to full damages because the jury found in question number six that the VA proved by a preponderance of the evidence that it would have taken the same action without the

consideration of retaliation. *Pl.'s Mot.* 1-2. He describes the jury's verdict as a mixed-motive verdict. *Id.*

Mr. Palmquist bases his motion on the Rehabilitation Act's incorporation of the "remedies, procedures, and rights" set forth in various sections of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* *Id.* at 2-3. Specifically, he notes that the Rehabilitation Act incorporates 42 U.S.C. § 2000e-5(g). *Id.* (citing 29 U.S.C. § 794a(a)(1)). He says § 2000e-5(g) addresses "what remedies are available upon a finding of an impermissible motivating factor when the employer proves it would have taken the same adverse employment action in the absence of the impermissible motivating factor" and entitles him to declaratory relief, injunctive relief, attorney fees, and costs. *Id.* at 2 (citing 42 U.S.C. § 2000e-5(g)(2)(B).

Observing that the United States Supreme Court and the First Circuit have held that § 2000e-5(g)(2)(B)'s mixed-motive remedies are not available under the Age Discrimination in Employment Act (ADEA) and the anti-retaliation provision of Title VII respectively, Mr. Palmquist distinguishes the Rehabilitation Act from those provisions. *Id.* at 3-5 (citing *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009); *Tanca v. Nordberg*, 98 F.3d 680 (1st Cir. 1996)). He contends that, unlike the ADEA and Title VII's anti-retaliation provision, the Rehabilitation Act expressly incorporates all of Title VII's remedies, including its mixed motive-remedies. *Id.* at 5.

Moreover, he argues that the Americans with Disabilities Act's (ADA) incorporation of Title VII's mixed-motive remedies reinforces his contention. *Id.* at 5-8. First, he contends that the Court should interpret the Rehabilitation Act consistently with the ADA. *Id.* at 5 n.2. Second, he cites legislative history and case law to support his assertion that the ADA's incorporation of Title VII's remedies means that Title VII's mixed-motive remedies are available in mixed-motive cases under the ADA. *Id.* at 6-8

### 2. Motion for Judgment as a Matter of Law

Mr. Palmquist further argues that the Court should grant him judgment as a matter of law under Rule 50(b). *Id.* at 9 (citing FED. R. CIV. P. 50(b)). Again, he turns to the Verdict Form and notes that the jury found that Mr. Palmquist's complaints about not receiving the Chief of Voluntary Services positions were protected under federal law and that Ms. Aichner's March 2006 employment reference was an adverse employment action. *Id.* (citing *Verdict Form*). He argues that given these two findings, a reasonable jury could only find for him on questions three, five and six of the Verdict Form. *Id.*

Mr. Palmquist points to the trial testimony to support his argument. *Id.* at 10. He notes that Ms. Aichner acknowledged telling Ms. Tate about Mr. Palmquist's protected activity in her March 2006 employment reference, and he asserts that the VA presented no legitimate non-discriminatory reason Ms. Aichner referenced the protected activity. *Id.* He contends that Ms. Aichner's state of mind in providing the reference is irrelevant. *Id.* at 12. Instead, the VA's failure to

present a legitimate non-discriminatory reason leaves no doubt that the protected activity was a motivating factor in the adverse employment reference, entitling him to judgment as a matter of law. *Id.* at 11-12.

### 3.    Motion for New Trial

In the alternative to judgment as a matter of law, Mr. Palmquist moves for a new trial. *Id.* at 12-13. He argues that "there is no reasonable basis for a jury verdict for the Defendant on issues number 3, 5, and 6" for the reasons in his motion for judgment as a matter of law. *Id.* at 13.

### B.    The VA's Response

The VA responds that the Rehabilitation Act does not provide for mixed-motive relief, and that Mr. Palmquist would not be entitled to such relief even if it did. *Def.'s Opp'n* at 9. It agrees that the Rehabilitation Act incorporates the "remedies, procedures, and rights" in § 2000e-5(g). However, the VA argues that the specific provision providing for mixed-motive remedies is expressly limited to plaintiffs who prove a violation of 42 U.S.C. § 2000e-2(m), which provides for liability whenever "race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at 11 (quoting 42 U.S.C. § 2000e-2(m)). The VA contends that § 2000e-2(m) represents Congress's limited response to the Supreme Court's holding in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)—that an employer has an absolute defense to a discrimination claim if it can prove it would have taken the same adverse action absent discrimination. *Id.* 10-11. The VA maintains that *Price*

*Waterhouse*'s holding still applies to claims of discrimination based on disability or retaliation because Congress's response did not extend to those claims. *Id.* at 11. He cites competing case law to counter Mr. Palmquist's. *Id* at 12-13.

Addressing Mr. Palmquist's motion for judgment as a matter of law and for a new trial, the VA argues that there was substantial evidence that Ms. Aichner was not motivated by retaliatory animus. *Id.* at 4-5. It counters Mr. Palmquist's contention that Ms. Aichner's mental state is irrelevant, citing case law for the proposition that retaliation contemplates an intention to punish. *Id.* at 5. The VA points to Ms. Aichner's positive feelings for Mr. Palmquist and her belief that she gave him a positive reference. *Id.* at 7-9. The VA observes that Ms. Aichner did not know the qualifications for the RVSR position and cites evidence that a positive quality for one position could be a negative quality for another. *Id.* at 7-9. Moreover, it asserts that it presented evidence that Ms. Tate had numerous, legitimate, non-discriminatory reasons not to recommend Mr. Palmquist. *Id.* at 8-9.

### C.    **Mr. Palmquist's Reply**

Mr. Palmquist replies that the VA ignores the plain language of the Rehabilitation Act that incorporates mixed-motive remedies. *Pl's Reply* at 1-2. He asserts that the remedies are appropriate in this case because Congress has determined that "a jury finding of an impermissible motivating factor in an adverse employment action warrants significant legal remedies." *Id.* at 2. He contends that this determination is bolstered by the "strong national policy to eradicate the evils of employment discrimination." *Id.* 3. He is especially concerned with the potential

future effects of past discrimination, so he seeks to have adverse comments expunged from personnel records and to enjoin any reference to those comments. *Id.* He asserts that the VA's use of Mr. Palmquist's protected activity as an "important consideration" in the hiring process and its misunderstanding of the federal statutory mandate for an affirmative action program demonstrate a lack of training in the laws against retaliation and discrimination. *Id.* at 4-6. He reiterates his position that Ms. Aichner's "good intent or lack of discriminatory intent" is irrelevant. *Id.* at 7 (quoting *Albemerale Paper Co. v. Moody*, 422 U.S. 405, 422 (1975)).

## III. DISCUSSION

### A. Legal Standard

Mr. Palmquist brought this claim for unlawful retaliation under the Rehabilitation Act, 29 U.S.C. § 791. To prove retaliation, Mr. Palmquist was required to establish that (1) he engaged in conduct protected by the statute; (2) he experienced an adverse employment action; and, (3) there was a causal connection between the protected conduct and the adverse employment action. *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (2006). Because the VA introduced evidence that it would have taken the same action absent consideration of retaliation, this became a mixed-motive case. In a mixed-motive employment discrimination case, an employer has an affirmative defense if it is able to prove by a preponderance of the evidence that it would have taken the same action absent retaliation.[3] *Desert*

---

[3] The parties dispute the strength of such an affirmative defense. Mr. Palmquist contends that it is only a partial affirmative defense and that he is entitled to judgment in his favor and at least some

*Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989).

## B. Motion for Mixed-Motive Remedies

Mr. Palmquist's motion for mixed-motive remedies raises questions about the interplay of several federal employment statutes. The Rehabilitation Act's 29 U.S.C. § 794a(a)(1) provides the remedies for those aggrieved by violations of § 791. § 794a(a)(1) in turn incorporates remedies from Title VII. Specifically, it incorporates 42 U.S.C. § 2000e-5(g). At issue is whether the jury verdict in Mr. Palmquist's case authorizes the Court to grant the remedies provided by § 2000e-5(g)(2)(B).

§ 2000e-5(g)(2)(B) allows limited remedies "[o]n a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor." This provision can be referred to as the mixed-motive remedy because it provides some recourse to a plaintiff who suffers harm that is at least partially motivated by discrimination but that would have occurred absent the discrimination. The mixed-motive remedy complements the substantive violation in § 2000e-2(m), which provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

---

remedies regardless of the VA's ability to prove the affirmative defense. *Pl.'s Mot.* The VA retorts that a successful affirmative defense is an absolute bar to liability and remedies. *Def.'s Opp'n.*

Mr. Palmquist argues that he is entitled to the limited damages in Title VII's mixed-motive remedy provision because the jury found that retaliation was a motivating factor in the VA's decision not to hire him but that the VA would not have hired him even absent the retaliation. *Verdict Form*. He bases this argument on two theories. First, he asserts that § 794a(a)(1) "expressly incorporates" Title VII's mixed-motive remedies. *Pl.'s Mot.* at 2-5 (Docket # 185) (*Pl.'s Mot.*). Second, he argues that the Court should interpret the Rehabilitation Act consistently with the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq.*, under which courts have recognized mixed-motive remedies. *Id.* at 5-8.

Turning to Mr. Palmquist's contention that the Rehabilitation Act expressly incorporates mixed-motive remedies, the Court disagrees. § 794a(a)(1) says that the "remedies, procedures, and rights" provided in 42 U.S.C. §§ 2000e-5(f) through (k) "shall be available with respect to any complaint under section 791 of this title to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." § 2000e-5(g)(1) generally provides remedies for persons aggrieved by an "unlawful employment practice." § 2000e-5(g)(2) limits those remedies in certain cases. For example, § 2000e-5(g)(2)(A) provides that certain remedies are only available when a plaintiff was discriminated against "on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title." 42 U.S.C. § 2000e-3(a) prohibits retaliation against an employee who opposes a practice that violates Title VII. Further tailoring remedies to certain claims is § 2000e-5(g)(2)(B), which specifies

that its remedies are only available "[o]n a claim in which an individual proves a violation under section 2000e-2(m)." As explained above, 2000e-2(m) makes unlawful any employment practice that is at least partially motivated by race, color, religion, sex, or national origin.

The First Circuit has held that the limited remedies provided under § 2000e-5(g)(2)(B) are not available in all employment discrimination cases. In *Tanca v. Nordberg*, 98 F.3d 680, 682 (1st Cir. 1996), the First Circuit considered whether Title VII's mixed-motive damages provision extended to claims under Title VII's retaliation provision. The *Tanca* Court began by recounting the history of the relevant law. It noted that in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Supreme Court concluded that an employer could not be liable for gender discrimination if it could prove that it would have taken the same action even if it had not taken gender into account. *Id.* at 681. "A court that finds for a plaintiff under this standard has effectively concluded that an illegitimate motive was a 'but-for' cause of the employment decision." *Price Waterhouse*, 490 U.S. at 249. Subsequent cases "extended the *Price Waterhouse* analysis to a series of other discrimination contexts." *Tanca*, 98 F.3d at 681. However, the *Tanca* Court observed that Congress partially overruled *Price Waterhouse* in 1991 by passing section 107 of the Civil Rights Act, codified at 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B). *Id.* at 681-82. Section 107 "establishes that if the plaintiff proves a violation of [§ 2000e-2(m)], but the defendant demonstrates that it 'would have taken the same action in the absence of the impermissible motivating factor,' the

court may grant declaratory and injunctive relief as well as attorney's fees." *Id.* at 682.

The *Tanca* Court held that mixed-motive liability did not attach in Title VII retaliation cases; instead, the *Price Waterhouse* standard still applied. *Id.* at 682-85. The First Circuit observed that the mixed-motive remedy provision "plainly states that it applies to 'a claim in which an individual proves a violation under § 2000e-2(m).'" *Id.* at 682. The mixed-motive remedy provision does not similarly reference the retaliation provision, codified at § 2000e-3. As such, the First Circuit concluded that "[o]n its face . . ., the statute seems to express an intent not to preclude application of *Price Waterhouse* in the context of mixed-motive retaliation cases." *Id.* at 683. The First Circuit read the plain language of the § 2000e-5(g)(2)(B) as making a § 2000e-2(m) violation a prerequisite to mixed motive liability. Several circuits have joined the First Circuit in holding that mixed-motive remedies do not apply to Title VII retaliation claims. *See Kubicko v. Ogden Logistics Services*, 181 F.3d 544, 552 n.7 (4th Cir. 1999); *McNutt v. Bd. of Trustees of Univ. of Ill.*, 141 F.3d 706, 709 (7th Cir. 1998); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935-36 (3d Cir. 1997). *See also Lewis v. Young Men's Christian Assoc.*, 208 F.3d 1303, 1305 (11th Cir. 2000) (mixed-motive remedies do not apply to retaliation claims under Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*); *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848, 852 (8th Cir. 2000) (citing above cases in support of conclusion that mixed motive remedies do not apply to retaliation claims under the False Claims Act). Just as there is no reference to

Title VII retaliation, there is no reference to Rehabilitation Act retaliation in § 2000e-5(g)(2)(B).

Mr. Palmquist addresses *Tanca* and urges that, unlike the Title VII retaliation provision, the Rehabilitation Act expressly incorporates the "remedies, procedures, and rights" in § 2000e-5(g). Yet, in addition to providing remedies for mixed-motive discrimination, § 2000e-5(g) provides remedies for general Title VII violations and for retaliation. In other words, the Rehabilitation Act incorporates a section that provides for mixed-motive remedies in certain situations and excludes mixed-motive remedies in other situations. It would require a logical leap to conclude that the mixed motive remedies are available in every § 794a cause of action. Even if mixed-motive remedies applied to some Rehabilitation Act actions, a more intuitive construction would be that Congress intended that the "remedies, procedures, and rights" for retaliation claims under the Rehabilitation Act parallel those for retaliation claims under Title VII, in which case *Tanca* precludes mixed-motive liability. In light of this statutory ambiguity and the First Circuit's holding in *Tanca*, the Court cannot conclude that § 794a incorporates Title VII's mixed-motive provision.

The Court next considers Mr. Palmquist's assertion that mixed motive remedies are available under the Rehabilitation Act because they are available under the ADA. Mr. Palmquist is correct that § 791 incorporates the standards of proof of the ADA. *See* § 791(g); *Palmquist v. Peake*, Civil No. 07-98-B-W, 2009 WL 1133459, at *2 (D. Me. Apr. 27, 2009) ("Thus, the anti-retaliation provision of 42

28

U.S.C. § 12203(a) is incorporated into the affirmative action provision of 29 U.S.C. § 791(b)). Mr. Palmquist makes three points: First, he says that the ADA incorporates all of the remedies provided under Title VII; second, he contends that the legislative history of the 1991 amendments to the Civil Rights Act suggests that Title VII's mixed motive remedies applied to the ADA; third, he says that the "majority of courts have applied Title VII's motivating factor standard and remedies in ADA cases." *Pl.'s Mot.* at 6-7.

Having carefully reviewed the statutory language and the cases cited by Mr. Palmquist, the Court concludes that mixed-motive remedies are not available in ADA retaliation cases. There is a circuit split on this issue. The Fourth, Fifth, and Eighth Circuit Courts of Appeals have either held or stated in dicta that Title VII's mixed motive remedies are available to ADA plaintiffs. *Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999); *Buchanan v. City of San Antonio*, 85 F.3d 196, 200 (5th Cir. 1996); *Pedigo v. P.A.M. Transport, Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995).[4] The Seventh and Eleventh Circuits maintain that liability does not attach in ADA cases

---

[4] Mr. Palmquist additionally cites cases from the Ninth and Eleventh Circuits to support his proposition. *Pl.'s Mot.* at 7 (citing *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1063-65 (9th Cir. 2005); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-77 (11th Cir. 1996)). However, those cases did not hold that ADA plaintiffs may be entitled to mixed-motive remedies. Rather, they held that the ADA's causation standard does not require the plaintiff to prove that discriminatory or retaliatory conduct was the "sole" cause of the adverse employment action. *Glacier Northwest*, 413 F.3d at 1063-65; *McNely*, 99 F.3d at 1076. Under *Glacier Northwest* and *McNely*, liability still does not attach unless the plaintiff can prove that the defendant would not have taken the adverse employment action "but for" the impermissible consideration. 413 F.3d at 1064-65 (positively citing *McNely* and its "but-for" standard and explaining that plaintiff must demonstrate that "a discriminatory reason *more likely* motivated the employer") (internal quotations omitted); 99 F.3d at 1076 ("we hold that the ADA imposes liability whenever the prohibited motivation makes the difference in the employer's decision, *i.e.*, when it was a "but-for" cause"). Thus, the VA would not be liable under the *Glacier Northwest* and *McNely* standard because the jury found that the VA would have taken the same action absent any impermissible consideration; in other words, the jury did not find that the VA would have hired Mr. Palmquist for the RVSR "but for" the impermissible consideration.

unless a plaintiff can prove that the defendant would not have taken adverse employment action but for an impermissible consideration. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010); *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996).

The Seventh Circuit opinion is particularly illuminating because it was decided with the benefit of clarifying language from the United States Supreme Court. In *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957 (7th Cir. 2010), the plaintiff brought an ADA disability discrimination claim against her former employer, alleging that her employer discharged her because it regarded her as disabled. As here, the jury returned a mixed-motive verdict, finding that the employer discharged the plaintiff because of its perception that she was disabled but that the defendant would have discharged the plaintiff absent that perception. *Serwatka*, 591 F.3d at 958. The Seventh Circuit held that the plaintiff was not entitled to the remedies provided by § 2000e-5(g)(2)(B). *Id.* at 598-64. Like the *Tanca* Court, the *Serwatka* Court began by reviewing the Supreme Court's decision in *Price Waterhouse*. *Id.* at 959. It noted that Congress's enactment of the Civil Rights Act of 1991 altered the *Price Waterhouse* holding in two ways: 1) it made unlawful "any employment practice motivated by a person's race, color, religion, sex or national origin, 'even though other factors also motivated the practice'" and 2) it authorized limited relief to plaintiffs even "when an employer has shown that it would have taken the same action in the absence of illegal motive." *Id.* at 959-60 (citing 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B) for the two respective changes).

The *Serwatka* Court emphasized that although the ADA "cross references the *remedies* set forth in section 2000e-5(g)(2)(B) for mixed-motive cases, it does not cross-reference the provision of Title VII, section 2000e-2(m), which renders employers *liable* for mixed-motive employment decisions." *Id.* at 962. In the absence of complete incorporation of the 1991 amendments to Title VII, the *Serwatka* Court turned for guidance to the Supreme Court's recent decision in *Gross v. FBL Fin. Services, Inc.*, 129 S. Ct. 2343 (2009). *Id.* at 960-62. In *Gross*, the Court held that mixed-motive liability was not available under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* 129 S. Ct. at 2349. In reaching this conclusion, the *Gross* Court observed that when Congress amended Title VII in 1991, it did not similarly amend the ADEA. The Court turned to the language of the ADEA, which makes it unlawful for an employer to discriminate against an employee "because of such individual's age." *Id.* at 2350 (citing 29 U.S.C. § 623(a)(1)). The Supreme Court interpreted "because of" to mean that an employer is liable when discrimination "was the 'reason' that the employer decided to act." *Id.* Under this construction, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Id.* at 2351.

Guided by *Gross*, the *Serwatka* Court held that the ADA imposed the same "but for" burden on the plaintiff. It concluded that "the importance that the [*Gross*] [C]ourt attached to the express incorporation of the mixed-motive framework into Title VII suggests that when another anti-discrimination statute lacks comparable

language, a mixed motive claim will not be viable under that statute." *Serwatka*, 591 F.3d at 961. The *Serwatka* Court then reviewed the language of the ADA. Like the ADEA, the ADA only imposes liability for employment decisions made "because of" discrimination. *Id.* (citing 42 U.S.C. § 12112(a)). Even though the ADA—unlike the ADEA—incorporates Title VII's remedies, it does not incorporate the Title VII provision that makes mixed-motive employment decisions unlawful. *Id.* at 962. Nor does the ADA have its own provision akin to Title VII's mixed-motive provision. *Id.* Accordingly, the *Serwatka* Court held that "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability." *Id.*

The Court finds *Serwatka* more persuasive than the authority from other circuits holding that mixed-motive remedies apply to ADA claims. The Fourth, Fifth and Eighth Circuits each assumed that the ADA incorporated Title VII's mixed motive liability provision—§ 2000e-2(m)—simply by incorporating Title VII's remedies. *See Pedigo*, 60 F.3d at 1301; *Baird*, 192 F.3d at 470; *Buchanan*, 85 F.3d at 200. However, the *Gross* Court cautioned that "we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" 129 S. Ct. at 2349 (quoting *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)).

Moreover, even if the Court were to side with the circuits that allow mixed motive remedies for individuals aggrieved by substantive disability discrimination, the same reasoning would not necessarily apply to ADA retaliation cases.

Notwithstanding the Eighth Circuit's application of mixed-motive remedies to ADA disability discrimination, a district court in that circuit held that "42 U.S.C. § 2000e-5(g)(2)(B) does not authorize an award of attorney's fees in mixed-motive retaliation cases" under the ADA. *Dehne v. Medicine Shoppe Int'l, Inc.*, 261 F. Supp. 2d 1142, 1148-49 (E.D. Mo. 2003). As support, the *Dehne* Court cited *Tanca* and a number of other court of appeals cases that have held mixed-motive remedies do not apply to Title VII retaliation claims. *Id.* Thus, even courts that recognize mixed-motive liability in non-Title VII substantive discrimination actions may not extend that recognition to retaliation claims. *See also Miller v. Pilgrim's Pride Corp.*, Civil No. 5:05CV00064, 2007 WL 2570219 at *2 (W.D. Va. Aug. 31, 2007) (holding that "the provisions in 42 U.S.C. § 2000e-2(m) do not apply to claims of retaliation" under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, despite the Fourth Circuit's holding in *Baird* that mixed-motive remedies are available for ADA discrimination claims). Indeed, Mr. Palmquist does not direct the Court to a single case that has recognized mixed-motive liability for a retaliation case in any context.

The Court appreciates the parties' attempts to construe a sometimes-mystifying web of employment statutes. For every case asserting that employment discrimination statutes must be interpreted consistently, there seems to be another distinguishing the statutes based on linguistic anomalies. Despite this confusion, the Court is convinced by the reasoning in *Gross*, *Tanca*, and *Serwatka*. The remedies available under § 2000e-5(g)(2)(B) are expressly contingent on a finding of

liability under § 2000e-2(m). The Court cannot read mixed-motive liability into statutes that do not either expressly incorporate § 2000e-2(m) or independently prohibit mixed-motive discrimination. The jury's finding that the VA would have made the same decision absent impermissible considerations constituted a successful absolute affirmative defense.

### C.    Motion for Judgment as a Matter of Law

#### 1.    Legal Standard

Mr. Palmquist moves for judgment as a matter of law pursuant to Rule 50(b). FED. R. CIV. P. 50(b). To succeed he must demonstrate that as a matter of law "the facts and inferences are such that no reasonable factfinder could have reached a verdict against the movant." *Webber v. Int'l Paper Co.*, 326 F. Supp. 2d 160, 165 (D. Me. 2004) (citing *Santos v. Sunrise Med., Inc.*, 351 F.3d 587, 590 (1st Cir. 2003)). The Court must not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir. 2003). The standard of review for motions for judgment as a matter of law requires the Court "to view the evidence 'in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.'" *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quoting *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 (1st Cir. 1997)). A jury verdict should not be set aside as a matter of law "unless there was only one conclusion the jury could have reached." *Id.* (citing *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987)). Specifically, the Court's review "is

weighted toward preservation of the jury verdict;" the Court will uphold the jury verdict "unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]." *Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 41-42 (1st Cir. 2002) (internal quotation omitted).

## 2. Analysis

Mr. Palmquist's motion for judgment as a matter of law is premised on the proposition that once he submitted evidence that Ms. Aichner mentioned Mr. Palmquist's protected activity in an employment reference, the burden shifted to the VA to prove that the statement was not retaliatory. In other words, he sees it as a matter of law that once a plaintiff presents evidence that a defendant mentioned protected activity in an employment reference, the plaintiff has met his burden of showing that the mention of protected activity was motivated by retaliatory animus. He says that evidence of adverse conduct is itself evidence of retaliatory animus.

This Court disagrees. *See Price Waterhouse*, 490 U.S. at 251 ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision"); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 826 (1991) (holding that words alone do not necessarily constitute retaliatory animus). Despite Mr. Palmquist's earnest contentions, the burden to prove causation remained on him at all times. This truth can be obscured by courts' frequent reliance on the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). However, the First Circuit has

35

indicated that that framework is not necessary after all of the evidence has been submitted. In *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 720 (1st Cir. 1994), it said that:

> [W]hen . . . an employment discrimination action has been submitted to a jury, the burden-shifting framework has fulfilled its function and backtracking serves no useful purpose. To focus on the existence of a prima facie case after a discrimination case has been fully tried on the merits is to "unnecessarily evade[] the ultimate question of discrimination vel non."

(quoting *United States v. Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 713-14 (1983)). *See also Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) (questioning *McDonnell Douglas* framework's utility to post-trial analysis); *White v. New Hampshire Dep't of Corrections*, 221 F.3d 254, 264 (1st Cir. 2000) (holding that jury instructions need not "follow the exact regimen of *McDonnell Douglas*"); *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 421 (1st Cir. 1996) (approving the trial court's sidestepping the framework and focusing on whether "on the totality of the evidence presented," the plaintiff had proven that discrimination triggered the firing). Here, the verdict form reflected that the burden of proving causation was Mr. Palmquist's. The jury found that he did not prove that Ms. Aichner's negative employment reference was motivated by retaliatory animus.

Nevertheless, if the Court were to apply the burden-shifting framework, it would conclude that the VA presented sufficient evidence that Ms. Aichner's employment reference was legitimate and non-retaliatory. The VA's burden on this point was one of presentation, *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 36

(1st Cir. 2010); *Lewis v. City of Boston*, 321 F.3d 207, 214 (1st Cir. 2003), a burden it easily met.

It is not clear from the verdict what the jury thought was negative about Ms. Aichner's job reference. Ms. Aichner admitted in her testimony that she told Ms. Tate that Mr. Palmquist used his veteran's preference and watched to make sure he got interviews. *Trial Tr. I* 74:3-7. She further admitted that she told Ms. Tate of an instance when Mr. Palmquist went to a patient representative because he did not get an interview. *Id.* 74:8-12. She clarified that the instance she was referring to was Mr. Palmquist's 2004 protected activity. *Id.* 74: 24-25. It is possible that the jury viewed this as constituting an adverse employment action. However, the jury may have regarded Ms. Aichner's allusions to other qualities of Mr. Palmquist as constituting adverse employment action. Specifically, Ms. Aichner told Ms. Tate that Mr. Palmquist had a tendency to wander and not focus. *Id.* 163:25-164-2. Ms. Aichner testified that she probably made that statement in response to one of Ms. Tate's questions and that it was not motivated by retaliation. *Id.* 164: 14-19. The jury was entitled to believe her.

Moreover, there was ample evidence that Ms. Aichner was not motivated by retaliation. The Court disagrees with Mr. Palmquist's contention that motive and intent are irrelevant to his claim. *See Pl.'s Mot.* at 12; *Pl.'s Reply* at 7. The holdings of the cases he cites for that proposition are inapposite. In *Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991), the Supreme Court held that an employment policy that expressly treats a protected class differently from others

evinces discriminatory intent, precluding the need for further inquiry into the employer's motive. Absent such a facially discriminatory policy, the plaintiff is not excused from proving discriminatory intent. *See AT & T Corp. v. Hulteen*, 129 S. Ct. 1962, 1970-71 (2009); *Mumid v. Abraham Lincoln High School*, 618 F.3d 789, 794-95 (8th Cir. 2010). There is no evidence of a facially discriminatory policy here.

In another case cited by Mr. Palmquist, *Gregory v. Daly*, 243 F.3d 687, 698-70 (2d Cir 2001), the Second Circuit did not say that an employer's motive is irrelevant to a sex discrimination claim; it merely clarified that the particular form of discrimination does not matter.[5] In fact, the *Gregory* Court went on to consider a retaliation claim and focused on whether the employer responded to the plaintiff's complaints with "retaliatory animus." *Id.* at 701.

Finally, Mr. Palmquist cited *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422 (1975). *Pl.'s Reply* at 7. *Albemarle* dealt with an employment practice that was "discriminatory in effect." 422 U.S. at 425. The Supreme Court has distinguished between "intentional discrimination (known as 'disparate treatment') and "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672 (2009). The discriminatory effect in *Albemarle* fell into the latter category. 422 U.S. at 425. Unlike a disparate-impact plaintiff, "[a] disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Ricci*, 129 S. Ct. at 2673 (quoting *Watson*

---

[5] As illustrations, the *Gregory* Court stated that the law does not "delineate distinct claims for employers who dislike women, doubt their abilities, demand that they conform to sex stereotypes, or want their policies to reflect actuarial differences between the sexes." 243 F.3d at 699.

v. *Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)).  The Supreme Court has compared retaliation claims to disparate treatment claims, asserting that retaliation is a form of intentional discrimination because "[r]etaliation is, by definition, an intentional act." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005).  Although the *Albemarle* Court may have disclaimed an intent element in disparate impact cases, the combination of *Ricci* and *Jackson* forecloses an extension of that principle to retaliation cases.

Consistent with the Supreme Court's language, the First Circuit has repeatedly phrased plaintiffs' burden of proving causation in retaliation cases in terms of "retaliatory animus," "retaliatory intent," and "retaliatory motive." *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010); *Vera v. McHugh*, 622 F.3d 17, 34 (1st Cir. 2010); *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 36 (1st Cir. 2010).  This does not merely mean that the action itself must be intentional.  In interpreting the meaning of animus in the retaliation context, the First Circuit has equated it to "vengeful preoccupation[s]" and grudges.  *Rosenfeld v. Egy*, 346 F.3d 11, 17 (1st Cir. 2003); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991).  Similarly, the First Circuit has said that retaliation is "motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice." *Noviello v. City of Boston*, 398 F.3d 76, 87 (2005).  These are clear indications that an alleged retaliator's mindset is relevant to proving the causation element of a retaliation claim.

There was ample evidence from which a jury could find Ms. Aichner's mention of Mr. Palmquist's protected activity did not stem from retaliatory animus. Ms. Aichner testified that she thought her phone conversation with Ms. Tate was a "favorable reference" for Mr. Palmquist that would help him get the job. *Trial Tr. I* 79:7-11. She stated that she did not intend to retaliate against him. *Id.* 170:23-171-1. She said that she liked Mr. Palmquist and had no stake in his protected activity so she had no reason to retaliate against him. *Id.* 171:2-11.

Taking the evidence of the relationship between Ms. Aichner and Mr. Palmquist as a whole, the jury could have reasonably concluded that Ms. Aichner did not intend to retaliate against Mr. Palmquist. Ms. Aichner testified that she hired Mr. Palmquist in April 2004 for a Unit Coordinator position at Iron Mountain. *Id.* 99:10-13. She testified that he "seemed upbeat, jolly," and to have "a positive personality that would fit good into our units." *Id.* 101:8-10. She testified that Mr. Palmquist was a very competent and well-liked employee but that he tended to get distracted from his work. *Id.* 108:15-114:21. Ms. Aichner was aware that Mr. Palmquist complained when he was not hired for the Chief of Voluntary Services position in 2004. *Id.* 66-68,121-125. But she said she did not hold the complaint against him because "[e]veryone has that right" and she "had no reason to punish or retaliate against that." *Id.* 68:16-20, 125:14-21.

The jury could have found that Ms. Aichner's evaluations of Mr. Palmquist between the time of his 2004 protected activity and her 2006 reference to Ms. Tate, support her lack of retaliatory intent. In that time, Ms. Aichner gave Mr.

Palmquist two annual performance appraisals and two written performance appraisals in connection with promotions for which he applied. *Id.* 58:22-59:13. Each appraisal was entirely favorable and contained nothing negative. *Id.* 58:24-65:1

Ms. Aichner also testified to a strong personal relationship between Mr. Palmquist and herself. She liked Mr. Palmquist personally and helped him find a house to live in close to hers. *Id.* 115:13-116:15. Mr. Palmquist and his son would occasionally visit Ms. Aichner's house so his son could play with Ms. Aichner's yellow lab, and Ms. Aichner babysat for Mr. Palmquist's son on at least one occasion. *Id.* 116:18-117:21. Ms. Aichner testified that their friendly and neighborly relationship lasted until Mr. Palmquist moved to Maine in 2006 and that she still likes him. *Id.* 171:22-24. When Mr. Palmquist took the stand, he verified that Ms. Aichner remained friendly toward him even after she knew of his protected activity. *Trial T. III* 506:22-507:14.

There was also evidence that Ms. Aichner thought her reference of Mr. Palmquist to Ms. Tate was positive. For example, she told Ms. Tate that Mr. Palmquist was "very knowledgeable of computer and gathering statistical data." *Id.* 73:13-15. Ms. Aichner's testimony intimated that the exhibit containing Ms. Tate's notes from their conversation excluded Ms. Aichner's expansion on comments she made. *Id.* 79:17-18. Indeed, Ms. Tate acknowledged that her notes summarized and "rephrased" what Ms. Aichner said and that they might not reflect their conversation "word for word." *Trial Tr. II* 197:9-14. Ms. Aichner testified that she

tried to answer Ms. Tate's questions honestly and thought her answers would be considered positive for Mr. Palmquist. *Id.* 77:4-80:12. Specifically, she testified that her comments about Mr. Palmquist being pro-veteran would be considered positive because he was applying for a position that involved helping veterans. *Id.* 79:14-80:1. She noted that she had called Mr. Palmquist pro-veteran in previous positive appraisals and that she intended to convey the same message to Ms. Tate. *Id.* 134:5-14, 140:17-141:12. Similarly, Ms. Aichner testified that she thought her reference to Mr. Palmquist's protected activity would be considered positive because it would show his enthusiasm for advancement in the VA. *Id.* 80:16-81:6. She said that any negativity attached to her comments should be attributed to her answering the questions truthfully and not knowing the qualifications for the position for which Mr. Palmquist was applying. *Id.* 78:6-13, 81:7-17, 163:18-164:13.

Ms. Tate's testimony further raised an inference that Ms. Aichner may have conveyed negative information despite her intention to provide a positive reference. Ms. Tate testified that a Rating Specialist must be fair and objective. *Trial Tr. II* 239:22-240:13; 284:9-285:7. As such, while Mr. Palmquist's pro-veteran stance may be a considered desirable for some positions in the VA, it could be seen as biased in a Ratings Specialist. Moreover, Ms. Tate testified that she "did not get the feeling that Ms. Aichner was trying to prevent [her] from selecting Mr. Palmquist for the position." *Trial Tr. II* 211:13-14. Finally, the only two individuals privy to the conversation between Ms. Aichner and Ms. Tate both testified that Ms. Aichner intended to give Mr. Palmquist a positive reference.

Because there was ample evidence from which a jury could find that retaliation was not a motivating factor in Ms. Aichner's employment reference, the Court denies Mr. Palmquist's motion for judgment as a matter of law.

### D.    Motion for New Trial

The Court denies Mr. Palmquist's motion for a new trial for the same reasons it denies his motion for judgment as a matter of law.

## IV.    CONCLUSION

Because the Rehabilitation Act does not entitle plaintiff's to mixed-motive remedies, the Court DENIES Mr. Palmquist's Motion to Amend the December 3, 2010 Judgment (Docket # 185) and because there was sufficient evidence to support a jury verdict on questions 3, 5, and 6 on the Verdict Form, the Court DENIES Mr. Palmquist's Motion for Judgment as a Matter of Law and his Motion for a New Trial (Docket # 185).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 26th day of August, 2011